# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LTD., ) | |
|     Plaintiff, ) | 3:10-cv-00029 JWS |
|     vs. ) | ORDER AND OPINION |
| MARINE MECHANICAL INC., ) | [Re: Motion at docket 55] |
|     Defendant. ) | |

## I. MOTION PRESENTED

Defendant Marine Mechanical Inc. ("MMI") filed a motion for partial summary judgment and exhibits in support at docket 55. In its motion, MMI requests that the court grant summary judgment in its favor on issues related to the amount of damages plaintiff American President Lines, Ltd. ("APL") can recover. Specifically, MMI seeks a determination that APL cannot recover from MMI (1) any part of the $10 million deductible under the insurance policy APL was contractually obligated to maintain; (2) damages already paid in full by APL's insurers; (3) attorney's fees APL incurred in pursuing its insurance claim; and (4) the $1.3 million insurance payment APL's parent company made for clearing its insurance loss record and obtaining a lower renewal premium on its global insurance policy. MMI's motion also seeks a determination that, if

-1-

it is liable to APL, the indemnity provision in Article 7 of the contract between the parties limits its liability to $3 million.  The applicability of the indemnity provision was more fully briefed in relation to APL's motion at docket 57, and the court's order on the motion at docket 183 renders moot all issues surrounding MMI's liability under the indemnity provision.  Thus, the indemnity provision, and MMI's limited liability under that provision, will not be addressed in the present order.

APL's response is at docket 74, and its supporting materials are at dockets 75 through 78.  MMI's reply is at docket 83.  APL filed a surreply at docket 92.  Oral argument on the motion at docket 55 was heard on May 30, 2013.

MMI also objects to a portion of APL's supporting evidence and filed its objection at docket 84.  Specifically, it objects to the declaration and report of Ron Rakich and the declaration and report of Dave Rudolph.  APL responds at docket 89.  The response includes a revised declaration from Ron Rakich, which specifically incorporates by reference his expert report, obviating any hearsay objection.  The court ruled on MMI's objection in its recent order at docket 183, concluding that MMI's objection to the declaration of Ron Rakich is without merit and that his declaration and expert opinion as to the meaning of the term "all risk physical damage insurance" used in the contract at issue could be considered and concluding that the declaration of Dave Rudolph could be considered, but that his expert report could not because it constitutes hearsay.

## II. BACKGROUND

APL is a marine carrier that operates marine terminals around the world, including Dutch Harbor, Alaska ("Dutch Harbor Terminal").  In 1991 APL entered into two crane maintenance contracts with Marine Maintenance, Inc., whereby Marine Maintenance agreed to maintain and repair container gantry cranes at APL's terminals.  The contract at issue in this case (the "Contract") covers the maintenance of APL's cranes in Seattle and its one crane in Dutch Harbor (the "Crane").[1]  A separate contract

---

[1] A copy of the Contract is located at docket 55-1.

entered into at the same time between the parties covered APL's cranes at APL's Oakland, California, terminal.[2]

In 2003, Mickey Hawke, MMI's current president, formed MMI to take over Marine Maintenance's contracts with APL.[3] MMI purchased the assets of Marine Maintenance, and Marine Maintenance, with APL's consent, assigned the two contracts to MMI, with MMI simply stepping into Marine Maintenance's shoes with respect to performance under the contracts.[4]

The Contract requires MMI to perform the crane maintenance and repair services that are set forth in Schedule A "in an efficient, expert and workmanlike manner."[5] Schedule A includes a section on the securing of cranes, which requires MMI to "insure that the proper manufacturer's/APL's instructions on securing and unsecuring the crane(s) are complied with, including the specific requirements for setting the heavy pins and storm tiedowns at the completion of every operation."[6]

The Contract contains an indemnity provision set forth in Article 7 that requires MMI to indemnify APL in certain circumstances:

> [MMI] shall defend, indemnify and hold harmless APL, . . . against all suits, actions, claims, costs or demands of any nature and description (including attorneys' fees and expenses) to which the indemnitees may be subject or put by reason of injury or death to any person or persons or damage to any property, including, but not limited to, cargo and the terminal property, caused solely or in part by the negligence of [MMI].[7]

The Contract also addresses insurance requirements. MMI must maintain worker's compensation insurance and comprehensive general liability insurance.

---

[2]Doc. 55-21.

[3]Doc. 74-1 at pp. 6-7.

[4]Doc. 1-4 at p. 3.

[5]Doc. 55-1 at p. 2.

[6]Doc. 55-1 at p. 12.

[7]Doc. 55-1 at p. 4.

-3-

Pursuant to Article 8(b) of the Contract, APL must maintain "all Risk Physical Damage" insurance to cover the crane:

> APL shall procure and maintain all Risk Physical Damage insurance covering the cranes. Such insurance shall contain a provision by the terms of which APL's insurer(s) agree(s) to waive any and all rights of subrogation which it may have against [MMI] by reason of any payment under said policy or policies. Nothing herein shall prevent APL from procuring such insurance subject to such limits of coverage and deductibles as APL shall deem satisfactory, however, APL shall be responsible for payment of any deductibles or losses under the deductibles.[8]

APL met this insurance obligation through a global property insurance policy procured by its parent company, Neptune Orient Lines ("Policy").[9] The Policy covered APL's cranes and other real and personal property, and contained a section providing coverage for physical damages and a section providing coverage for business interruption losses resulting from such damages. The Policy contained a $10 million deductible per occurrence.[10]

Sometime during the evening of December 4, 2009, high winds blew the Crane over. The specific facts surrounding the Crane's fall are more specifically discussed in the court's order at docket 183. Suffice it to say for purposes of this order, high winds had been forecast for Thursday, December 3 through Saturday, December 5. On December 4, 2009, the Crane was not tied down because MMI's crane operator on duty at the Dutch Harbor Terminal at that time did not tie it down before leaving for the day.

The Crane was completely destroyed. It crushed a shed made of empty shipping containers. Oil and fuel spilled from the Crane. APL submitted an insurance claim under the Policy, seeking payment for both damages to replace the Crane and business interruption losses.[11] Initially, the insurance company offered to pay APL an initial

---

[8]Doc. 55-1 at p. 5.

[9]Doc. 55-3; Doc. 55-5 at p. 7.

[10]Doc. 55-3 at p. 2.

[11]Doc. 55-2.

-4-

interim payment of $2.5 million, based on the insurance adjuster's conclusion that the minimum coverage under the policy was $12.5 million and after application of the $10 million deductible.[12] The risk manager for APL's parent company indicated acceptance of the interim payment of $2.5 million, but that acceptance was retracted.[13] Later, after the insurance company found the minimum coverage to be $18 million and allocated the damages to reflect that $7.2 million of this amount involved property damages and $10.8 million involved business interruption losses, and after application of the $10 million deductible, it offered APL an interim payment of $8 million.[14] APL only accepted that interim payment for the business losses and instructed the insurance company to apply its $10 million deductible to the business losses.[15] APL therefore received an initial payment of about $800,000. APL and its insurers eventually settled the entire insurance claim in April of 2012. The total amount APL received from its insurers was $28 million.[16]

APL filed its complaint against MMI in Alaska state court in 2010. The complaint alleges a breach-of-contract claim, as the Contract was in effect at the time of the December 4, 2009 incident, and APL alleges that MMI's failure to tie down the Crane and its failure to supervise its maintenance operations at the Dutch Harbor Terminal breached MMI's maintenance obligations under the Contract. The complaint also includes a professional negligence claim and negligence claim based on the failure to tie down the Crane. APL seeks damages resulting from the loss of the Crane. MMI removed the case to federal court.

---

[12]Doc. 55-14; Doc. 55-6 at pp. 9-10.

[13]Doc. 55-15.

[14]Doc. 55-7.

[15]Doc. 55-8.

[16]Doc. 75-1 at p.5.

-5-

In the order at docket 183, the court granted in part and denied in part APL's motion for summary judgment, concluding that MMI's failure to tie down the Crane on December 4, 2009, was a breach of the Contract and that the indemnification provision in Article 7 of the Contract does not apply.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[18] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[19] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[20] The reviewing court may not weigh evidence or assess the credibility of witnesses.[21]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[22] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[23] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing

---

[17] Fed. R. Civ. P. 56(a).

[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[19] *Id.*

[20] *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[21] *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[22] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[23] *Id.* at 323-25.

-6-

the existence of a genuine issue for trial.[24] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[25] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[26]

## IV. DISCUSSION

**A. Choice of law**

A federal court sitting in diversity applies the choice-of-law rules of the forum state, which is Alaska.[27] Alaska courts apply the choice-of-law rules set forth in the Restatement (Second) of Conflict of Laws.[28] Under those rules, the court applies the law of the state with the most significant relationship to the transaction and the parties.[29] To determine which state has the most significant relationship in the absence of a choice-of-law clause in the contract, the court considers where the contract was entered, negotiated, and performed; where the subject matter is located; and where the parties are domiciled or incorporated.[30]

In this case, the Contract does not contain a choice-of-law provision so the court must consider the various factors listed above. The Contract was entered into and negotiated in California. At the time of contracting both APL and Marine Maintenance

---

[24] *Anderson,* 477 U.S. at 248-49.

[25] *Id.* at 255.

[26] *Id.* at 248-49.

[27] *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).

[28] *Savage Arms, Inc. v. W. Auto Supply Co.,* 18 P.3d 49, 53 (Alaska 2001).

[29] Restatement (Second) of Conflict of Laws §188(1)-(2) (1971).

[30] *Id.*

-7-

(the original party to the Contract) were domiciled in California. The Contract is to be performed in Washington and Seattle, as the Contract covers maintenance of APL's cranes in both locations. The subject matter, the cranes, are also located in Washington and Alaska. The subject matter of the current dispute is located in Alaska.

In this case, the breach-of-contract issue involves damage to the Crane and MMI's maintenance obligations toward that crane pursuant to the Contract. Thus, the place of performance and the subject matter of the Contract carry more weight than the place of negotiations and domicile of the parties. While both Washington and Alaska are implicated in the Contract, given that the incident at issue occurred in Alaska and involved damage to the Crane, the court concludes that Alaska is the state with the most significant contact to this dispute, and its law should apply. Furthermore, based on the comments to Restatement (Second) of Conflict of Laws, when a physical thing is the principal subject of the contract, "it can often be assumed that the parties, to the extent they thought about the matter at all, would expect that the local law of the state where the thing . . . was located would be applied to determine many of the issues arising under the contract."[31]

MMI argues that California law should apply given the fact that there is a similar companion contract entered into between the parties related to APL's cranes in Oakland, California. The court is not persuaded that the companion contract is relevant to the choice-of-law determination. The contracts are separate, and there is no indication the parties expected the two contracts to be interpreted uniformly or pursuant to California law. Furthermore, MMI does not show how the outcome of the dispute would necessarily be different depending on whether California or Alaska law is applied.

**B. Insurance deductible**

---

[31] Restatement (Second) of Conflict of Laws §188, cmt (1971).

-8-

Article 8(b) of the Contract requires APL to maintain "all Risk Physical Damage insurance" covering the Crane. It further provides that APL can "[procure] such insurance subject to such limits of coverage and deductibles as APL shall deem satisfactory," but that APL "shall be responsible for payment of any deductibles or losses under the deductibles."[32]

APL asserts that "all Risk Physical Damage" insurance only covers physical damage, not business interruption losses stemming from such damage. The Policy, which APL used to meet its insurance obligation under the Contract, happens to cover both physical loss and business interruption loss, but does not provide a separate deductible for these different types of losses; it simply provides for a $10 million deductible per occurrence. APL negotiated with the insurer so that it only received an initial interim payment for the $10.8 million business interruption losses confirmed at that time, and thus the $10 million deductible was applied to those business interruption losses, meaning APL suffered $10 million in business interruption losses and recovered the remaining $800,000 from its insurers. APL claims that because the $10 million deductible was applied to business interruption losses and not Crane replacement costs, it is not contractually obligated to pay for the deductible and can recover the $10 million from MMI as damages.[33] MMI disagrees, arguing that under Article 8(b) APL must maintain first party insurance covering all losses related the Crane's damage or at least that Article 8(b) requires APL to be responsible for paying the deductible under the Policy even if the deductible was applied toward business interruption losses instead of physical losses.

---

[32]Doc. 55-1 at p.5.

[33]APL also argues in its response that the indemnification provision in Article 7 of the Contract makes MMI liable for all business interruption losses associated with crane damage and thus it should be able to recover the insurance deductible, as well as all other costs associated with business interruption, from MMI under Article 7, but that argument was also raised in APL's motion at docket 57 and considered and denied by the court in the order at docket 183.

-9-

**1. All risk physical damage insurance**

In order to determine whether summary judgment is appropriate on the issue of damages under the Contract, the Court must consider whether the insurance provision in Article 8(b) is ambiguous. "An ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole."[34] The court can consider extrinsic evidence when determining whether there is an ambiguity in the first instance.[35]

The parties dispute the meaning of the term "all Risk Physical Damage insurance," which is not defined in the Contract. MMI asserts that the term encompasses first-party, all-risk coverage. APL asserts that it only encompasses physical damage. APL provided evidence as to the meaning of the term "all Risk Physical Damage insurance." It provided a report from Ron Rakish, an expert with 40 years in the risk management and insurance industry, concerning the use of this term in the insurance field. At docket 183 the court ruled that Mr. Rakish's report and opinion were admissible. MMI did not provide any contrary evidence. Thus, the court concludes the term "all Risk Physical Damage insurance" unambiguously refers to insurance covering physical damage to property.[36] All risk physical damage insurance does not provide coverage for business interruption losses.[37] The term "all risk" refers to the perils that can cause physical damage to property, not the losses that can be incurred because of such damage.[38] Although APL obtained both all risk physical damage insurance and business interruption insurance under one policy, it does not

---

[34] *Wessells,* 562 P.2d at 1046.

[35] *Id.*

[36] Doc. 78

[37] *Id.*

[38] *Id.*; *see also Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 75 (3d Cir. 1989) ("'All risk' is not synonymous with 'all-loss.'").

-10-

automatically follow that physical damage insurance encompasses business interruption insurance. Indeed, the Policy sets forth coverage for physical damage and coverage for business interruption in separate sections. There is no evidence to suggest that the parties intended something different than the meaning assigned pursuant to industry custom and practice. Thus, the court concludes that Article 8(b) does not require APL to maintain business interruption insurance and pay for deductibles related to business interruption insurance.

MMI cites an Indiana case, *Morsches Lumber, Inc. v. Probst*,[39] and a Missouri case, *Rock Springs Realty Inc. v. Waid*,[40] for the proposition that because APL agreed to purchase all risk physical damage insurance, it agreed that all losses would be borne by its insurers. Unlike the plaintiffs in *Morsches* and *Probst*, APL is not seeking damages covered by its all risk physical damage insurance in this case. As noted above, all risk physical damage insurance does not include business insurance, and thus, APL did not agree to have its insurers bear business interruption losses.

In its reply brief MMI also cites *Dresser Industries, Inc. v. Foss Launch and Tug Co.*[41] and *Gillen v. Holland*[42] for the proposition that if a property owner procures insurance for the benefit of both parties to a contract, the owner becomes solely responsible for any risk of loss. Both *Gillen* and *Dresser* involved bailment situations, and in both cases the Alaska Supreme Court recognized that while generally a bailee is liable for a loss of bailed goods caused by failure to exercise the requisite degree of care, that rule may be modified by a contract between the parties and the bailor can assume the risk of loss taking on responsibility for fully insuring the bailed goods. The bailor's agreement to purchase insurance for the benefit of both parties is sufficient to

---

[39]388 N.E.2d 284 (Ind. Ct. App. 1979).

[40]392 S.W.2d 270, 278 (Mo. 1965).

[41]560 P.2d 393 (Alaska 1990).

[42]797 P.2d 646 (Alaska 1990).

-11-

shift the risk of loss of the bailed goods to him. These cases are distinguishable. They are limited to the narrow context of a bailor-bailee relationship and addressed the general rule that a bailee is liable for loss of bailed goods caused by failure to exercise the requisite degree of care.[43] Furthermore, in *Gillen* and *Dresser* the Alaska Supreme Court noted that the risk of loss can be assumed by one party if that party agrees to provide *full insurance*. In the case at hand, APL only agreed to purchase insurance covering physical damage from all risks not insurance covering all losses.

**2. Responsibility for deductible under the Contract**

MMI asserts that even if APL was not contractually obligated to insure against business interruption losses, the Contract unambiguously requires the Policy's deductible, even if it was applied toward business interruption losses, to be borne by APL. The contract states as follows:

> APL shall procure and maintain all Risk Physical Damage insurance covering the cranes. . . . Nothing herein shall prevent APL from procuring such insurance subject to such limits of coverage and deductibles as APL shall deem satisfactory, however, APL shall be responsible for payment of any deductibles or losses under the deductibles.[44]

MMI focuses on the Contract's requirement that APL pay for *any* deductibles. It interprets the provision to mean APL must pay for any deductibles associated with its all risk physical damage insurance policy, even if that deductible also applies to an additional type of insurance. MMI argues that APL had the ability to choose whatever deductible-premium structure it deemed satisfactory, and it chose to insure the Crane under a policy that did not distinguish between a deductible for physical damage and a deductible for business interruption losses. Because the $10 million deductible could have been applied to the physical damage insurance under the Policy, MMI believes

---

[43] *See C.J.M. Const., Inc. v. Chandler Plumbing & Heating, Inc.*, 708 P.2d 60, 62 n.4 (Alaska 1985) (rejecting the application of strict construction of indemnity contracts and distinguishing *Dresser* because it involved a case of bailment).

[44] Doc. 55-1 at 5.

-12-

that APL is contractually obligated to pay for it and thus cannot recover the deductible as damages.

The court reads the Contract differently. MMI's interpretation of the Contract would have APL responsible for any deductibles *under the policy*. It does not say that. It states that APL can procure "such insurance" — clearly referring to all Risk Physical Damage Insurance—subject to deductibles as it deems satisfactory. The unambiguous language of Article 8(b) allows APL to procure all risk physical damage insurance with a deductible, but it does not require APL to do so. If a deductible is applied to losses covered under its all Risk Physical Damage insurance, then APL must bear that cost. But ultimately, the Contract gives APL the discretion to have its physical damage insurance subject to a deductible or not. APL "deem[ed] it satisfactory" to not have the deductible applied to physical damages, but instead only to business losses. APL put forth evidence as to why it chose to do so,[45] but motive is irrelevant because under the Contract it clearly had discretion as to how to structure deductibles.

MMI argues that the Policy itself requires the deductible be applied to the entire loss, and does not allow it to be allocated to one of the two coverages under the Policy. But the deductible clause does not address whether or how the deductible can be allocated to specific losses. The deductible clause provides as follows:

> All losses, damages, or expenses arising out of each and every occurrence shall be adjusted as one loss, and Underwriters shall not be liable unless the Insured sustains a loss in excess of the amount(s) designated above, and then only for Underwriters share of such excess.[46]

MMI cites no authority for the proposition that this clause governs how to allocate the deductible. Instead, the authority cited by APL shows that the purpose of requiring all losses arising out of every occurrence to be adjusted as one loss is to prevent an insured from submitting multiple claims to avoid policy limits and to prevent insurers

---

[45]Doc. 75.

[46]Doc. 55-3 at p. 2.

-13-

from applying more than one deductible.[47]  In fact, in this case the insurers agreed to allocate losses and apply the deductible to just the business interruption losses, demonstrating that the Policy did not dictate how the deductible would applied.[48]

### 3. Subrogation waiver cases

In its reply brief, MMI relies on cases interpreting the subrogation waiver provision in the American Institute of Architects' (AIA) standard contractor agreement to support its argument that APL should be responsible for the entire deductible.  The cases MMI cite hold that when a party uses an existing insurance policy to meet a contractual obligation to insure property, the subrogation waiver provision in the AIA contract applies not only to the payment received for damages the party was contractually required to insure against, but also more broadly to all payments made under the policy.  MMI argues that this reasoning should be applied to deductibles as well, such that when a party uses an existing policy to meet a contractual obligation to insure property, the requirement that the party pay for any deductibles associated with the required insurance applies broadly to any and all deductibles under the policy, even if the deductible was applied to a type of coverage that the party was not contractually obligated to obtain.  In other words, MMI argues that APL should be required to pay for the deductible applied to the business interruption losses because APL chose to meet its contractual obligation through a broad policy that covered more than physical damages.

The cases interpreting the subrogation waiver provision in the standard AIA contract are not persuasive in this situation.  First, MMI does not cite a case where the

---

[47]Couch on Insurance §§ 175:1117, 178:2 (3d. ed.); *APMC Hotel Mgmt., LLC v. Fid. & Deposit Co.*, 2011 WL 5525966 (D. Nev. Nov. 10, 2011) (dispute over whether thefts constituted multiple occurrences for purposes of applying policy limits); *Basler Turbo Conversions LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082 (E.D. Wis. 2009) (dispute over whether an employees' thefts over a period of time constituted one "occurrence" for purposes of application of the deductible).

[48]Doc. 74-7 at p. 12.

-14-

reasoning supporting the broad interpretation of the subrogation waiver provision in the AIA contract has been extended to the insured's obligation to bear a deductible. APL on the other hand cites a case where the subrogation waiver was interpreted broadly (to include all payments made under a policy used to meet a contractual property insurance obligation), but the insured was nonetheless able to sue for its deductible.[49]

Second, as APL notes, courts are divided on the issue of whether the subrogation waiver language in the AIA contract results in waivers of subrogation for insurance coverage that is not contractually required.[50] Alaska has not addressed the issue, but MMI argues that Alaska would apply a similar reasoning that would make APL responsible for all deductibles under the Policy, even if the Policy is more extensive than required under the Contract, citing *State v. Underwriters at Lloyds, London.*[51] For the reasons discussed in APL's supplemental brief at docket 92, the court concludes that *Underwriters* is not instructive.

Third, a review of the AIA contract language at issue reveals that it is not similar to the insurance provision in Article 8(b) of the Contract. The AIA subrogation waiver provision waives subrogation for damages covered by property insurance required under the contract, *as well as damage covered by any property insurance applicable to the "work,"* which is a defined term under the contract.[52] The AIA contract's waiver is explicitly extended to payments made under other property insurance the insured may have as long as it is "applicable" to the work. Article 8(b) does not have comparable language. Furthermore, even under the broadest reading, the waiver provision is still

---

[49] *Stop & Stop Supermarket Co. v. ABCO Refrigeration Supply Corp.,* 842 A.2d 1194 (Conn. Super. Ct. 2003).

[50] *See, e.g., Copper Mountain v. Indus. Sys., Inc.*, 208 P3d 692 (Colo. 2009); *Midwestern Indem. Co. v. Systems Builders, Inc.,* 801 N.E.2d 661 (Ind. Ct. App. 2004).

[51] 755 P.2d 396 (Alaska 1988).

[52] *See, e.g., Lloyd's Underwriters v. Craig and Rush, Inc.*, 32 Cal. Rptr. 2d 144, (Cal. Ct. App. 1997).

-15-

limited to one type of insurance: physical property insurance. Nothing in the cases extends the waiver to other forms of insurance, such as business interruption insurance.

**C. Collateral benefits**

MMI argues that APL cannot recover damages already paid in full by its insurers under the Policy because the insurer expressly waived all rights of subrogation against MMI as to insurance payments and because APL cannot obtain a double recovery through the collateral source rule.

Under the common law collateral source rule, a tort victim is allowed to obtain a double recovery, that is, from both a collateral source and a tortfeasor, if the alternative would be to allow the tortfeasor to escape liability.[53] There is no case law in Alaska specifically addressing the issue of whether the common law collateral source rule applies in the context of a contract action. Regardless, the common law collateral source rule is not applicable in Alaska, because Alaska modified the rule in A.S. 09.17.070.

Under the statute, the court can reduce the claimant's jury award to reflect unsubrogated collateral source payments. However, rather than just fully deducting any collateral source payment, such as an insurance benefit, from the claimant's award, the statute gives the claimant credit for the amount paid to secure the right to that insurance benefit. Specifically, A.S. 09.17.070 provides:

> (a) After the fact finder has rendered an award to a claimant, and after the court has awarded costs and attorney fees, a defendant may introduce evidence of amounts received or to be received by the claimant as compensation for the same injury from collateral sources that do not have a right of subrogation by law or contract.
>
> (b) If the defendant elects to introduce evidence under (a) of this section, the claimant may introduce evidence of
> (1) the amount that the actual attorney fees incurred by the claimant in obtaining the award exceed the amount of attorney fees awarded to the claimant by the court; and

---

[53] *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 790 (Alaska 1999).

-16-

(2) the amount that the claimant has paid or contributed to secure the right to an insurance benefit introduced by the defendant as evidence.

(c) If the total amount of collateral benefits introduced as evidence under (a) of this section exceeds the total amount that the claimant introduced as evidence under (b) of this section, the court shall deduct from the total award the amount by which the value of the nonsubrogated sum awarded under (a) of this section exceeds the amount of payments under (b) of this section.

Based on the statute, there is a prohibition on double recovery but it is not absolute. Instead, the calculation of damages requires a process by which the final award is calculated based on the amount of the collateral benefit received and the amount the claimant paid to secure such a benefit.

Nothing in A.S. 09.17.070 expressly states that the statute is limited to tort actions. But given that the statute uses the term "injury" and based on the Alaska Supreme Court's dicta in *Chenga Corp. v. Exxon Corp.*, there is support for the conclusion that the statue only applies to tort cases, and more specifically personal injury cases.[54] Thus, the court concludes that the statute, and the process for calculating damages set forth therein, is not applicable to contract damages in this case.

**D. Costs related to APL's insurance claim**

MMI also asserts that the damages for a breach of contract cannot include the attorney's fees APL incurred in the process of pursing its insurance claim under the Policy, nor can it include the costs APL incurred to clear its insurance loss record after the incident. As the court ruled at docket 183, Article 7 does not apply. Thus, APL's argument that MMI is contractually obligated to indemnify APL for such costs under Article 7 must fail. The remaining question is whether these costs are recoverable as straight forward breach-of-contract damages.

---

[54] 991 P.2d 769, 791 n.88 (citing AS 09.17.040(a) as suggesting that the statutory version of the collateral source rule set out in AS 09.17.070 may apply only in cases of personal injury but finding it unnecessary to determine the scope of the statute given its holding that the there was no collateral source payment made).

-17-

Damages for breach of contract may only be recovered if the party seeking them proves they were reasonably foreseeable as a probable result of the breach at the time the contract was made.[55] Damages may be foreseeable as a probable result of a breach if they follow from the breach "in the ordinary course of events" or, because of special circumstances, "the party in breach had reason to know."[56]

The parties do not dispute that the Contract clearly allocates risk of physical loss of the Crane to APL, with APL taking on the responsibility to pay for the Crane's property insurance. Thus, the court concludes that attorney's fees and other costs associated with pursuing the property insurance claim and lowering the insurance premium rates was not a foreseeable damage for MMI's breach of contract, and APL cannot recover fees and costs associated with its physical insurance obligation. APL, however, also incurred costs and fees in relation to its business interruption insurance for which APL did not assume responsibility under the Contract, as noted above. The court must consider whether the costs and fees APL incurred in pursuing its business interruption insurance claim are recoverable as damages.

The amount APL paid to clear its insurance loss record and obtain a more favorable renewal rate is tantamount to a premium increase: instead of paying increased premiums, APL paid a lump sum amount to keep favorable rates. Courts addressing the issue of whether increased premium costs caused by a party's breach of contract have generally held that, as a matter of law, such costs are not foreseeable, speculative, and too remote, and thus cannot be recovered as damages.[57] Even in tort

---

[55] *Native Alaskan Reclamation and Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1219-20 (Alaska 1984).

[56] *Id.* (quoting Restatement (Second) of Contracts § 351, at 135 (1981)).

[57] *See, e.g., Sanford v. Patent Scaffolding Co.*, 33 S.E.2d 422 (Ga. 1945); *Barger Constr. Inc. v. Alliance Elec. Inc.,* 1996 WL 1038821 (Conn. C.P. 1996).

-18-

cases, courts consistently hold that increased premium costs cannot be recovered from a tortfeasor based on remoteness and lack of foreseeability.[58]

APL argues that the $1.3 million payment made to clear its insurance loss record is distinguishable from a general premium increase. It argues its payment was directly linked to the Crane accident and is subject to exact computation. APL does not cite evidence to support its assertion that the payment is solely linked to the accident or that it is subject to exact computation. Regardless, even assuming that such a payment to erase the Crane's loss from the insurance company's records was calculated solely on the Crane accident, it was not foreseeable that APL would pay a lump sum to erase the losses rather than seek other coverage for its cranes, and thus APL cannot meet its burden of proving foreseeability in regard to the $1.3 million payment.

MMI argues that APL cannot recover attorney's fees paid in connection with pursuing its claim under the Policy. This court agrees. Under Alaska law, attorney's fees are not considered an item of damages.[59] While a plaintiff may possibly seek attorney's fees incurred in bringing or defending a prior lawsuit that was caused by a defendant's breach of duty,[60] in this case, most of APL's attorney's fees associated with the insurance claim were not incurred in the process of an active lawsuit against the insurance provider. APL only filed a lawsuit against its insurers in April of 2012 after a long negotiation process and only weeks before the claim was ultimately settled. MMI did not do anything which forced APL to initiate suit against the insurers. APL chose to

---

[58] *Fischl v. Paller & Goldstein,* 282 Cal. Rptr. 802 (Cal. Ct. App. 1991); *Southland Constr., Inc. v. Greater Orlando Aviation*, 860 So. 2d 1031 (Fla. Dist. Ct. App. 2003); *Vogel v. Liberty Mut. Ins. Co.*, 571 N.W.2d 704 (Wis. Ct. App. 1997).

[59] *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1172 (Alaska 1998) ("We have previously held that attorney's fees generally cannot be awarded as damages - that fee awards are instead controlled by Civil Rule 82. . . . and "costs of protecting one's legal claim are unrecoverable as damages.").

[60] *See Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492, 496-98 (Alaska 1973) (plaintiff recovered attorney's fees from litigation against a third party caused by Transamerica's negligent breach of duty.)

-19-

retain attorneys to pursue its insurance claim at the outset and chose to file suit against its insurers to finalize payment under the Policy.

### V.  CONCLUSION

For the reasons set out above, the motion at docket 55 is **GRANTED in part and DENIED in part** as follows:

1) APL may seek to recover the Policy's $10 million deductible as damages.

2) APL cannot recover damages from MMI that were paid by APL's insurer under the Policy.

3) APL cannot recover the payment it made to clear its insurance loss record.

4) APL cannot recover attorney's fees associated with submitting and pursuing its insurance claim under the Policy.

DATED this 24th day of June 2013.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE